UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| REBECCA SWIFT, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ZYNGA GAME NETWORK, INC., et al.,<br><br>Defendants. | Case No: C 09-05443 SBA<br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Dkts. 18, 23 |

The parties are presently before the Court on Defendant Zynga Game Network, Inc.'s Motion to Dismiss First Amended Complaint (Dkt. 18), and Defendants Adknowledge, Inc. and KITN Media USA, Inc.'s Motion to Dismiss First Amended Class Action Complaint and Motion to Strike Class Action Allegations (Dkt. 23).[1] Having read and considered the papers filed in connection with these matters and being fully informed, the Court hereby DENIES the motions for the reasons set forth below. The Court, in its discretion, finds these matters suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b).

## I. BACKGROUND

### A. PLAINTIFF'S ALLEGATIONS

Defendant Zynga Game Network, Inc. ("Zynga") develops games that members of social networking websites, such as Facebook and MySpace, can play on those websites. Dkt. 13, FAC ¶ 1. For example, FarmVille is a game that is promoted and made available through Facebook's site. Id. ¶ 12. The game presents a "virtual world" where players can start and manage their own virtual farms. Id. Users are allowed to play the Zynga games free of charge. Id. ¶ 2. Zynga generates revenue from the games by selling virtual currency to players within

[1] Defendants Adknowledge, Inc. and KITN Media USA, Inc. are referred to collectively herein as "Adknowledge."

the games. Id. Each game is designed to be more enjoyable for users that have acquired increasing amounts of virtual currency. Id. ¶ 4. Players can use their virtual currency to obtain more in-game goods and services, unlock new levels of the game, gain competitive advantage over other players, or otherwise make the game more enjoyable. Id.

Virtual currency can be acquired when players slowly "earn" it by accomplishing various tasks in the game. Id. Additionally, users can purchase virtual currency directly from Zynga by using a credit or debit card. Id. ¶ 34. Zynga provides another way for users to acquire virtual currency: through "special offer" transactions that Zynga and Adknowledge (collectively, "Defendants") have created and developed to be integrated within each of Zynga's game applications. Id. ¶ 6. Through these transactions, Zynga provides users in-game virtual currency in exchange for users' participation in special offers provided by Zynga and its business partners, including Adknowledge. Id. These special offers are generally referred to in the industry as "lead generators." Id. ¶ 7.

Zynga partners with an offer aggregator, such as Adknowledge, to create and develop the interfaces within Zynga's games that allow Zynga game users to select a special offer in exchange for virtual currency. Id. ¶ 8. Once the user has completed the special offer presented by Defendants and another Zynga business partner (such as the provider of "wiki toolbar," "IQ Test," "Video Professor," or "GreenTea Purity"), the Zynga business partner pays Defendants for the lead generation, and Zynga remits to the user a certain amount of virtual currency. Id. The special offers created and developed by Defendants allegedly are misleading and often result in users subscribing to goods or services that they do not want or need. Id. ¶ 34. The Complaint also alleges that consumers who attempt to cancel services or obtain refunds are then met with roadblocks designed to thwart cancellation and/or refunds. Id.

For example, one of the special offers that has often appeared within various Zynga games is an online "IQ test." Id. ¶ 13. The offer indicates that the user can earn additional virtual currency by obtaining a certain score on an online IQ test. Id. To take the test, the user must provide his or her cell phone number, and is informed that the results of the test will be sent to the user via text message. Id. However, the user is unaware that, by providing his or

her cell phone number, he or she has unwittingly subscribed to a Short Message Service ("SMS") subscription and will be billed on a monthly basis through his or her cell phone bill. Id. Users who discover the charge on their phone bills are then met with hurdles as they attempt to cancel the service and/or obtain a refund. Id.

Plaintiff alleges that most, if not all, of the special offers within Zynga game applications have been "scams," which is the reason all special offers were apparently removed from Zynga games in November 2009, and only a handful of special offers are now available within Zynga games as of February 2010. Id. ¶ 33. According to Plaintiff, Zynga claims that it has eliminated special offers that are misleading to consumers. Id.

Plaintiff Rebecca Swift ("Plaintiff") alleges that she has used various Zynga game applications within Facebook, including FarmVille, Mafia Wars, YoVille!, and Roller Coaster Kingdom. Id. ¶ 36. In each of these applications, Zynga has attempted to induce Plaintiff to earn virtual currency by participating in special offers with Zynga business partners, including Adknowledge. Id. Plaintiff alleges that in or around April 2009, she provided her cell phone number to a business partner of Defendants, through a special offer created and developed by Zynga and Adknowledge, in order to be texted a "code" that she could use to redeem for "YoCash." Id. ¶ 37. YoCash is virtual currency within Zynga's YoVille! game. Id. Plaintiff was not informed that providing her cell phone number would result in charges to her cell phone bill. Id. Plaintiff alleges that "Defendants' misleading implementation of the special offer was a substantial factor in Plaintiff's decision to provide her cell phone number and enter into the transaction." Id. On April 16, 2009, and three times afterwards, $9.99 was charged to Plaintiff's cell phone bill without her knowledge or consent. Id. Plaintiff further alleges that all or part of these charges were obtained by Defendants. Id.

Moreover, on June 14, 2009, Plaintiff participated in a special offer – created and developed by Zynga and Adknowledge – for a "risk-free Green Tea Purity Trial" while playing the game YoVille!. Id. ¶ 38. The special offer indicated that Plaintiff could earn virtual YoCash if she participated in a "risk free trial" for a green tea herbal supplement. Id. The offer indicated that Plaintiff could cancel the trial anytime within fifteen days of her initial

order. Id. To participate in the program, Plaintiff provided her debit card number and was charged $5.95 for shipping and handling. Id. Plaintiff sent an email to Defendants' business partner, the apparent manufacturer of the supplements, asking to cancel her "Green Tea Purity Trial" on June 24, 2009, ten days after entering the fifteen-day "risk free trial," and after she received, mailed from China, a package of 30 green tea pills and three tea bags. Id. ¶ 39. On July 4, 2009, an unknown entity named "Support Green Tea" emailed Plaintiff, informing her that she would be charged $79.95, despite Plaintiff's prior request to cancel her trial offer. Id. ¶ 40. Plaintiff was unsuccessful at any further attempts to contact "Support Green Tea" via telephone. Id. On July 6, 2009, Plaintiff's bank account was charged $79.95, as well as a $2.38 "foreign transaction fee." Id. On July 20, 2009, Plaintiff's bank account was charged $85.90, as well as another $2.38 foreign transaction fee. Id. Sometime afterwards, she received, again mailed from China, a package of 30 green tea pills and three tea bags. Id.

### B. PROCEDURAL BACKGROUND

Plaintiff filed this putative class action on November 17, 2009. On February 10, 2010, Plaintiff filed a First Amended Complaint ("FAC"), bringing the following claims: (1) violation of the Unfair Competition Law (Cal. Bus. Prof. Code § 17200, et seq.) ("UCL"); (2) violation of the Consumers Legal Remedies Act (Cal. Civ. Code § 1770, et seq.) ("CLRA"); and (3) unjust enrichment. Plaintiff brings this action on behalf of a class of "[a]ll persons in the United States who from November 2005 to January 31, 2009 acquired or accumulated virtual currency or other virtual goods and services within a Zynga game application as part of an integrated special offer transaction presented through that application, and who was charged money as a result thereof." FAC ¶ 42.

Now, Zynga and Adknowledge have separately moved to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6), on the grounds that: Plaintiff's claims are barred by the Communications Decency Act of 1996 ("CDA"); and Plaintiff's claims sound in fraud but are not plead with the requisite particularity. Moreover, Adknowledge moves to dismiss

Plaintiff's claim for unjust enrichment as being an unavailable claim under California law, and moves to strike Plaintiff's class allegations under Federal Rule of Civil Procedure 12(f).[2]

## II. LEGAL STANDARD

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) insufficient facts to support a cognizable legal claim. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). In considering a Rule 12(b)(6) motion, the court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007). For a complaint to be dismissed because the allegations give rise to an affirmative defense, "the defense clearly must appear on the face of the pleading." McCalden v. California Library Ass'n, 955 F.2d 1214, 1219 (9th Cir. 1990). "If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir. 1986).

[2] Both sides have submitted requests for judicial notice in connection with their briefing. Specifically, Zynga has submitted a Request for Judicial Notice in Support of Zynga Game Network, Inc.'s Motion to Dismiss, asking the Court to take judicial notice of the full copy of an article quoted in the FAC. Dkt. 19. Likewise, Plaintiff has submitted a Request for Judicial Notice in Opposition to Zynga Game Network's and KITN Media USA's Motions to Dismiss, asking the Court to take judicial notice of a video clip, website, and picture contained in a website, which are referenced by, but not attached to, the FAC. Dkt. 29. No party has opposed these requests or disputed the authenticity of the exhibits. Therefore, Zynga's and Plaintiff's requests (Dkts. 19 and 29) are GRANTED. See Branch v. Tunnel, 14 F.3d 449, 456 (9th Cir. 1994) ("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss") overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 1119, 1127 (9th Cir. 2002).

# III. ANALYSIS

## A. DEFENDANTS' ASSERTIONS OF CDA IMMUNITY

Section 230 of the CDA immunizes providers of interactive computer services against liability arising from content created by third parties: "No provider ... of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c); Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1162 (9th Cir. 2008) ("Roomates.Com").[3] This grant of immunity does not apply if the interactive computer service provider is also an "information content provider," which is defined as someone who is "responsible, in whole or in part, for the creation or development of" the offending content. 47 U.S.C. § 230(f)(3) (emphasis added).

In passing Section 230, Congress sought to allow interactive computer services "to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." Roommates.Com, 521 F.3d at 1163. "In other words, Congress sought to immunize the removal of user-generated content, not the creation of content …." Id. As noted by the Ninth Circuit, "[i]ndeed, the section is titled 'Protection for 'good samaritan' blocking and screening of offensive material' … the substance of section 203(c) can and should be interpreted consistent with its caption." Id. The Ninth Circuit has further held that "close cases" must be resolved in favor of immunity. Id. at 1174.

### 1. The Face of the FAC Does Not Indicate that Zynga Is Entitled to CDA Immunity

Zynga argues that Plaintiff's claims are barred by the CDA because they treat Zynga as a publisher or speaker, and seek to hold Zynga liable for the content of third parties. In her opposition, Plaintiff does not dispute that Zynga is an "interactive computer service provider." However, Plaintiff argues that the CDA does not encompass her claims because Zynga is an

[3] Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." Id., § 230(f)(2).

"information content provider" not entitled to immunity. Specifically, Plaintiff alleges that Zynga has both created and developed the allegedly deceptive "special offers" at issue.

The Ninth Circuit's decision Roommates.Com is instructive. There, the defendant operated a website that attempted to match individuals looking for roommates with individuals seeking housing. Roommates.Com, 521 F.3d at 1161-1162. To accomplish this, the website required users to state their preferences for the gender, family status, and sexual orientation of prospective roommates. Id. Various fair housing groups sued Roommates.com, alleging that its business violated the federal Fair Housing Act by allowing members to assert discriminatory preferences for housing. Id. at 1162. The question before the court was whether the website was entitled to immunity under the CDA even though the allegedly discriminatory content originated from third parties. Id. at 1165. The Ninth Circuit, in an en banc decision, found that CDA immunity did not apply because the website was an "information content provider." Id.

In reaching its decision, the Ninth Circuit interpreted "development" of content as "referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness." Id. at 1168. In other words, an interactive computer service provider "helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." Id. Applying that interpretation, the Ninth Circuit observed that the portion of the Roomate.com profile "that is alleged to be unlawful is provided by subscribers in response to Roommate's questions, which they cannot refuse to answer if they want to use defendant's services." Id. at 1166. "By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information." Id. The court also distinguished between a website that merely provides "neutral tools" that may be utilized by third parties to post unlawful content, and a website that "both elicits the allegedly illegal conduct and makes aggressive use of it in conducting its business." Id. at 1171-1172.

Applying Rommates.Com here, the Court cannot determine at this juncture, based on the pleadings, whether Zynga is entitled to immunity under the CDA. Rather, the FAC alleges facts, which, if proven, could support the conclusion that Zynga is responsible, in whole or in part, for creating or developing the special offers at issue. Fundamentally, Plaintiff alleges that the special offers are desirable to users because they provide free virtual currency to be used in Zynga games. FAC ¶¶ 6, 8. In turn, Zynga is alleged to encourage acquisition of the virtual currency by designing their games to become more enjoyable as users obtain more virtual currency. Id. ¶¶ 3, 5. As noted by Plaintiff in her opposition, the lure of virtual currency is the most important "content" within the special offer because, without it, it is unlikely any user would ever participate in the offers. Additionally, Plaintiff alleges that Zynga is responsible for the design, layout, and format of the special offers, and the special offers appear directly within Zynga's games. Id. ¶¶ 12, 13, 33, 36, 37. Moreover, Plaintiff has alleged Zynga's "material contribution" to the alleged unlawful activity by asserting that Zynga designed its games to intentionally create the demand for the virtual currency offered in those games, and then used this demand to lure consumers into the allegedly fraudulent transactions. Id. ¶¶ 4-6, 8-9.

Zynga's reliance on Goddard v. Google, 640 F. Supp. 2d 1193 (N.D. Cal. 2009) is misplaced. In Goddard, the district court, on a motion to dismiss, found that Google was entitled to CDA immunity in connection with fraudulent advertisements appearing on its search engine. Id. at 1199. There, Google allowed companies that sold cell phone ring tones to post allegedly misleading ads on Google's search engine. Id. at 1194. The ring tone advertisements would only appear when certain keywords were entered into the search engine by consumers. Id. at 1197. The advertisers could select which keywords they wanted to associate with their advertisements, and Google provided them with a keyword suggestion tool to help them identify possible keywords. Id. The only contribution to the ads that Plaintiff could point to was Google's keyword suggestion tool. Id. Plaintiff alleged that by allowing advertisers to utilize this tool, Google had been transformed into an "information content provider" that was not entitled to CDA immunity. Id.

The district court determined that Google could not be held responsible for merely publishing the fraudulent advertisements on its search engine. Id. at 1198. Relying on Roomates.Com, the court found that Google did not "materially contribute to" or "enhance" the false advertising at issue. Id. The court reasoned that since Google provided a "neutral" tool that merely "suggested" key words that could be used by advertisers, those suggestions did not constitute a sufficient contribution to the ads to bring Google within the definition of a "content provider." Id.

Here, Plaintiff alleges an entirely different scenario. Specifically, Plaintiff has not alleged that Zynga is a "neutral" website that merely allows third parties to post advertisements. Instead, Plaintiff asserts that Zynga is a direct participant in the fraudulent transactions that are the subject of this case, as outlined above. Therefore, at this stage, Zynga's motion to dismiss based on CDA immunity is denied.

**2. The Face of the FAC Does Not Indicate that Adknowledge Is Entitled to CDA Immunity**

Adknowledge argues that Plaintiff's claims are barred by the CDA because Adknowledge is an "online intermediary that merely 'presents' third-party advertisements from its Internet 'interface' to end users." Dkt. 23, Def.'s Mot. 8. However, it is unclear from Plaintiff's allegations whether Adknowledge is an "interactive computer service provider," as that term is defined by the CDA. It is also unclear whether Adknowledge falls under the "information content provider" exception to CDA immunity. Indeed, whether Adknowledge qualifies for immunity under the CDA is a fact-based inquiry. As alleged, Adknowledge is described simply as an "aggregator" that solicits advertisements from third parties and then facilitates transactions between those parties and Zynga. FAC ¶¶ 6-8. Given the limited nature of a Rule 12(b)(6) challenge, the Court cannot determine, at this stage, whether Adknowledge is entitled to CDA immunity. It would be improper to resolve this issue on the pleadings and the limited record presented. Adknowledge's motion to dismiss based on CDA immunity is denied. See e.g., Perfect 10, Inc. v. Google, Inc., 2008 WL 4217837, *8 (C.D. Cal. 2008) ("preemption under the CDA is an affirmative defense that is not proper to raise in a Rule

12(b)(6) motion") (citing Doe v. GTE Corp., 347 F.3d 655, 657 (7th Cir. 2003) (immunity under 47 U.S.C. § 230(c) is an affirmative defense that a plaintiff is not required to plead around)).

**B. PLAINTIFF HAS ADEQUATELY PLEAD HER CLAIMS UNDER RULE 9(b)**

Defendants argue that Plaintiff's claims "sound in fraud," and therefore should be dismissed for failing to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that, when fraud is alleged, "a party must state with particularity the circumstances constituting fraud …." Fed. R. Civ. P. 9(b). The circumstances must "be specific enough to give defendants notice of the particular misconduct … so that they can defend against the charge and not just deny that they have done anything wrong." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (internal citations omitted). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Id. A party alleging fraud must "set forth more than the neutral facts necessary to identify the transaction." Id. "Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used)." Id.

"While fraud is not a necessary element of a claim under the CLRA and UCL, a plaintiff may nonetheless allege that the defendant engaged in fraudulent conduct." Id. at 1125. A plaintiff may allege a unified course of fraudulent conduct and rely on that course of conduct as the basis of that claim. Id. "In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading ... as a whole must satisfy the particularity requirement of Rule 9(b)." Id. In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, "identify the role of each defendant in the alleged fraudulent scheme." Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir. 2007) (internal brackets and citation omitted).

Here, Plaintiff admits that her allegations "sound in fraud." Dkt. 27, Pl.'s Opp. at 21. However, Plaintiff argues that, under the UCL, she "is merely required to plead the elements of a UCL claim which only requires proof that a defendant has engaged in a business practice that is 'likely to deceive the public.'" Id. Plaintiff's reliance on Gruen v. EdFund, 2009 WL 2136785 (N.D. Cal. 2009) in support of that contention is misplaced. In Gruen, the plaintiff's

UCL claim was not based on fraud; rather, the plaintiff alleged representations that were "likely," but not intended, to deceive. Id. at *5. The Gruen court specifically found that the plaintiff did not allege "an overarching fraudulent scheme to defraud Plaintiff or the public," and, therefore, the court held that the fraud pleading standard did not apply. Id. Instead, the plaintiff needed only to show that the practice was "likely to deceive the public." Id. In this case, Plaintiff's claims are predicated on Defendants' "fraudulent scheme," wherein Defendants intentionally "conspired" in attempts to "mislead" users into clicking on special offers that Defendants knew were "false and misleading." FAC ¶¶ 1, 30, 16, 33; see also id. ¶ 14 (the special offers "developed and created by Defendants" "have repeatedly mislead and defrauded users of Zynga games"). Accordingly, Plaintiff's claims must be analyzed under the requirements of Rule 9(b).[4]

**1. Allegations Against Zynga**

In this case, Plaintiff has satisfied Rule 9(b) with her allegations against Zynga because she has alleged the "who, what, when, where, and how" of Defendants' fraudulent scheme to incorporate "sham" offers into Zynga's online games, and Zynga's specific role in that fraudulent scheme.

Specifically, Plaintiff has explained "when" the fraudulent conduct was committed by alleging that she incurred charges on April 16, 2009 after receiving a texted "code" that could be used for virtual currency. FAC ¶ 37. In addition, Plaintiff indicates that she participated in a "risk-free Green Tea Purity Trial" special offer on June 14, 2009, asked to cancel her order for green tea supplements on June 24, 2009, was emailed regarding charges for the product on July 4, 2009, and was charged for the product on July 6, 2009 and July 20, 2009. Id. ¶¶ 38-40. Moreover, Plaintiff has explained "where" the fraudulent conduct occurred by describing the specific games and websites in which the allegedly deceptive and misleading special offers

[4] "To determine if the elements of fraud have been pleaded to state a cause of action we look to state law …. The elements of a cause of action for fraud in California are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." Kearns, 567 F.3d at 1126 (internal citation and quotation omitted).

appeared. Plaintiff alleges that the special offers are incorporated into game applications such as Mafia Wars, FarmVille, and YoVille! that users play on social networking websites such as Facebook and MySpace. Id. ¶¶ 1, 3-4, 8-9, 12-14, 16-17, 25, 31, 33, 36-38, 40-41, 45, 54.

Plaintiff has also sufficiently alleged the "who" as being Defendants, and has sufficiently alleged Zynga's role in the fraudulent scheme. In particular, Plaintiff repeatedly alleges that Zynga and Adknowledge provided, funded, created, and developed the allegedly deceptive and misleading special offers. Id. ¶¶ 6, 7, 8. Plaintiff has also states that special offers created, designed, funded and promoted by Defendants interfaced with games created by Zynga. Id. ¶¶ 6-9, 11-15.

Furthermore, Plaintiff has adequately plead the "what" and the "how" of Defendants' alleged fraudulent scheme. Plaintiff describes the misleading and deceptive special offer transactions in detail, including the specific misrepresentations or omissions upon which she and other putative class members relied. Id. ¶¶ 8, 9, 12, 13, 34, 35, 36-41. For instance, Plaintiff alleges that each of the special offers in which she participated failed to disclose that she would incur charges for her participation, that she would be charged repeatedly and, in the case of the Green Tea offer, that she would encounter difficulties in attempting to cancel. Id. ¶¶ 36-41. Also, Plaintiff includes in her FAC a link to a video where the allegedly fraudulent special offers are depicted in detail. Id. ¶ 14; see also Dkt. 29, Pl.'s RJN, Ex. 1. Plaintiff alleges that Zynga knew its advertisements were false by quoting Zynga's CEO, who is alleged to have admitted that the special offers were "designed to mislead consumers and generate increasing revenues for its business." FAC ¶ 16.

Zynga relies on Kearns in support of its argument that these allegations are not sufficient to satisfy Rule 9(b). There, the plaintiff filed a class action suit, alleging that Ford Motor Company and its dealerships acted illegally to increase sales of their Certified Pre-Owned ("CPO") vehicles. Kearns, 567 F.3d at 1122. The plaintiff alleged that defendants made false and misleading statements regarding the safety and reliability of its CPO vehicles in their sales materials. Id. at 1123. The Ninth Circuit affirmed the district court's dismissal of the plaintiff's UCL and CLRA claims for failing to comply with Rule 9(b). Specifically, the

court found that the plaintiff failed to allege "the particular circumstances surrounding" the misrepresentations, in that he failed to specify what the sales materials actually stated, and he failed to explain when he was exposed to those materials and what materials he actually relied upon. Id. at 1126. That is not the case here. As indicated above, Plaintiff has sufficiently alleged the particular circumstances of Defendants' fraudulent scheme.

**2. Allegations Against Adknowledge**

Separate from Zynga's challenge to the "who, what, when, where, and how" of Plaintiff's fraud allegations, Adknowledge argues that Plaintiff has failed to satisfy Rule 9(b) because she does not specifically allege any wrongful or fraudulent conduct attributable to Adknowledge and fails to differentiate among defendants.

Where a plaintiff has asserted claims based on fraudulent conduct against multiple defendants, the plaintiff is required to identify the role of each defendant in the alleged fraudulent scheme. Swartz, 476 F.3d at 765. However, Rule 9(b) does not require the plaintiff to "identify false statements made by each and every defendant." Id. at 764. Moreover, "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." Id.

Here, Plaintiff asserts sufficient factual allegations against Adknowledge concerning its particular role in the alleged scheme. In particular, Plaintiff alleges that Adknowledge – in its specific and distinct role as an offer aggregator – was responsible for helping users participate in the special offers and aggregating the offers that appeared within Zynga's games. FAC ¶ 8. Plaintiff further alleges that Adknowledge and Zynga acted in concert to develop and create the interface that encouraged Plaintiff and putative class members into accepting the special offers. Id. Furthermore, Plaintiff states that Adknowledge was paid by another business partner, such as the providers of "wiki toolbar," "IQ test," "Video Professor" or "Green Tea Purity," based on the leads generated by the special offers, and that Adknowledge functioned as a "buffer" to shield Zynga from liability for offers that Defendants knew were false and misleading. Id. ¶¶ 8-10.

Based on the factual allegations describing Adknowledge's role in this fraudulent scheme, Plaintiff asserts, on information and belief, that Adknowledge participated in the creation and development of the special offers to which she was exposed in April and June 2009, failed to inform the Plaintiff that she would incur repeated charges if she participated in those offers, and received a portion of the funds obtained from the Plaintiff. Id. at ¶¶ 37-41.

In sum, Plaintiff has sufficiently identified, at the pleading stage, Adknowledge's role in the alleged fraudulent scheme.

### C. PLAINTIFF'S UNJUST ENRICHMENT CLAIM

Adknowledge separately argues that Plaintiff's claim for Unjust Enrichment (Third Claim) should be dismissed because unjust enrichment is not a recognized cause of action in California, but rather is only a legal remedy. In her unjust enrichment claim, Plaintiff alleges that Defendants have knowingly and voluntarily been enriched by their unlawful conduct, that it would be inequitable for Defendants to retain their ill-gotten gains, and that Plaintiff and the class are entitled restitution in the amount of Defendants' ill-gotten gains. FAC ¶¶ 69-73.

Formally, "there is no cause of action in California for unjust enrichment." Melchior v. New Line Prods., Inc., 106 Cal.App.4th 779, 793 (2003). However, a "court may look past the formal label of a claim for 'unjust enrichment' if the allegations state a claim which allows for the type of recovery supported by the principle of unjust enrichment." Miletak v. Allstate Ins. Co., 2010 WL 809579 (N.D. Cal. 2010) (citing McBride v. Boughton, 123 Cal.App.4th 379, 387 (2004)). For instance, in Miletak, the court declined to dismiss the plaintiff's unjust enrichment claim, finding that while the unjust enrichment claim cannot stand alone as an independent cause of action, the plaintiff could seek relief based on an unjust enrichment theory in relation to his UCL claim. Id. * 8 (further finding that "Plaintiff may establish an unjust enrichment claim by proving that (1) the Defendants received a benefit (2) that it unjustly retained."). Applying those principles here, Plaintiff's UCL claim, at the pleading stage, could support a claim for unjust enrichment; therefore, Adknowledge's motion to dismiss Plaintiff's unjust enrichment claim is denied.

### D. MOTION TO STRIKE CLASS ALLEGATIONS

As a final matter, Adknowledge argues that Plaintiff has failed to allege an ascertainable class (as required by Federal Rule of Civil Procedure Rule 23), and therefore the Court should strike Plaintiff's class action allegations under Rule 12(f), which allows a court to strike "any redundant, immaterial, impertinent, or scandalous matter" from a complaint. Fed. R. Civ. P. 12(f). However, the Ninth Circuit has indicated that Rule 12(f) is not the proper vehicle for dismissing portions of a complaint when the Rule 12(f) challenge is really an attempt to have portions of the complaint dismissed; such a challenge is better suited for a Rule 12(b)(6) motion to dismiss or a Rule 56 motion for summary judgment. Whittlestone, Inc. v. Handi-Craft Co., --- F.3d ----, 2010 WL 3222417, * 4 (9th Cir. August 17, 2010) ("Were we to read Rule 12(f) in a manner that allowed litigants to use it as a means to dismiss some or all of a pleading … we would be creating redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already serves such a purpose."). Accordingly, Adknowledge's motion to strike Plaintiff's class allegations is denied.

## IV. CONCLUSION

For the above stated reasons.

IT IS HEREBY ORDERED THAT:



1. Defendant Zynga Game Network, Inc.'s Motion to Dismiss First Amended Complaint is DENIED.



2. Defendants Adknowledge, Inc. and KITN Media USA, Inc.'s Motion to Dismiss First Amended Class Action Complaint and Motion to Strike Class Action Allegations is DENIED.

3. A telephonic Case Management Conference is scheduled in this matter for **February 10, 2011 at 3:30 p.m**. The parties shall meet and confer prior to the conference and shall prepare a joint Case Management Conference Statement which shall be filed no later than ten (10) days prior to the Case Management Conference that complies with the Standing Order for All Judges of the Northern District of California and the Standing Order of this Court.

Plaintiff shall be responsible for filing the statement as well as for arranging the conference call. All parties shall be on the line and shall call (510) 637-3559 at the above indicated date and time.

4. This Order terminates Dockets 18 and 23.

IT IS SO ORDERED.

Dated: 11/2/10

SAUNDRA BROWN ARMSTRONG
United States District Judge